# In the United States Court of Federal Claims

No. 18-1965C
(Filed: September 23, 2019)

| | | |
|---|---|---|
| ROY LYNN MCCUTCHEN, et al., | ) | Keywords: Bump Stocks; Fifth |
| | ) | Amendment; Categorical Takings; |
| Plaintiffs, | ) | Regulatory Takings; Police Power |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

*Ethan A. Flint,* Flint Law Firm, LLC, Edwardsville, IL, for Plaintiff. *Adam M. Riley*, Flint Law Firm, LLC, Edwardsville, IL, Of Counsel.

*Nathaniel B. Yale*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for Defendant, with whom were *L. Misha Preheim*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Joseph H. Hunt*, Assistant Attorney General. *Melissa Anderson*, Associate Chief Counsel, Litigation, Bureau of Alcohol, Tobacco, Firearms and Explosives, Of Counsel.

## OPINION AND ORDER

**KAPLAN, Judge.**

On the evening of October 1, 2017, a lone gunman stationed himself in a high-rise, Las Vegas hotel room and fired 1100 rounds of ammunition downward onto a crowd attending a country music concert. Fifty-eight people were killed. Over eight hundred more were wounded by gunshots or as a result of the ensuing panic. When the authorities entered the shooter's hotel room, they found twelve semi-automatic weapons equipped with "bump stocks"—devices that allow a semi-automatic weapon to fire continuous rounds at a rate similar to that of a machinegun. See Barbara Goldberg et al., One Year Later, Las Vegas Honors 58 Killed in Mass Shooting, REUTERS, Oct. 1, 2018, https://www.reuters.com/article/us-lasvegas-shooting/one-year-later-las-vegas-honors-58-killed-in-mass-shooting-idUSKCN1MB3CO.

As of the date of this opinion, the mass shooting in Las Vegas remains the deadliest in American history. In its wake, the Department of Justice's Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") re-examined the status of bump-stock devices under federal firearms laws. Ultimately, after a period of notice and comment, it issued a final rule that re-

classified bump stocks as "machineguns" under the National Firearms Act of 1934 and the Gun Control Act of 1968, thereby outlawing their possession and sale effective March 26, 2019. The regulation specified that, to avoid prosecution, owners of bump stocks must either destroy their devices or abandon them at an ATF office by that date.

Plaintiff Roy Lynn McCutchen legally purchased and owns multiple bump-stock devices "for both his personal use and for economic gain." Class Action Compl. ("Compl.") ¶ 10, ECF No. 1. Plaintiff Paducah Shooter's Supply, Inc., is a registered firearms dealer that sells bump-stock devices and also operates a shooting range that occasionally hosts paid "machine gun shoots" where participants use bump-stock-type devices affixed to firearms. Id. ¶ 11. Both Plaintiffs complied with the final rule by destroying all of the bump-stock devices in their possession. Pls.' Opp'n to Def.'s Mot. to Dismiss ("Pls.' Opp'n") at 5, ECF No. 12.

Plaintiffs brought this putative class action on behalf of themselves and "[a]ll United States persons who have purchased a bump-fire stock or bump-fire type device, as listed in Exhibit 1 [to the complaint], for personal or commercial use, during the period extending from June 7, 2010, through and to the filing date of th[e] Complaint." Compl. ¶ 26. They allege that the ATF rule has effected a "taking" of their property for which just compensation is required under the Fifth Amendment. Id. ¶ 1.

Currently before the Court is the government's motion to dismiss the complaint under Rule 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC") for failure to state a claim. For the reasons set forth below, the government's motion is **GRANTED** and the complaint is **DISMISSED with prejudice**.

## BACKGROUND

### I.   Statutory Framework

To protect the public safety, Congress has enacted a series of statutes that regulate the manufacture, transfer, and possession of firearms generally—and machineguns in particular. These statutes include the National Firearms Act of 1934 ("NFA"), Pub. L. 73-474, 48 Stat. 1236 (codified as amended at I.R.C. §§ 5801–72); the Gun Control Act of 1968 ("GCA"), Pub. L. No. 90-618, 82 Stat. 1213 (amending 18 U.S.C. §§ 921–28 and I.R.C. ch. 53); and the Firearms Owners' Protection Act ("FOPA"), Pub. L. 99-308, 100 Stat. 449 (1986) (amending 18 U.S.C. §§ 921–29).

The NFA was enacted a year after Prohibition ended. Its purpose was, among other things, to regulate "lethal weapons . . . [that] could be used readily and efficiently by criminals and gangsters." H.R. Rep. No. 83-1337, at A395 (1954); see United States v. Thompson/Ctr. Arms Co., 504 U.S. 505, 517 (1992) (observing that it was "clear from the face of the Act that the NFA's object was to regulate certain weapons likely to be used for criminal purposes"). The NFA imposed a tax on the manufacture and transfer of certain types of firearms. See NFA § 2. It further required that the Secretary of the Treasury maintain a registry of such firearms (referred to in I.R.C. § 5841 as the National Firearms Registration and Transfer Record). See generally NFA.

Machineguns were among the firearms covered by the NFA. "Machine gun" was defined as "any weapon which shoots, or is designed to shoot, automatically or semiautomatically, more than one shot, without manual reloading, by a single function of the trigger." NFA § 1(b).

Some thirty-four years later, in the aftermath of the assassinations of President John F. Kennedy, Attorney General Robert Kennedy, and Dr. Martin Luther King, Jr., Congress enacted the GCA. See Gun Control Act of 1968, Bureau of Alcohol, Tobacco, Firearms and Explosives (July 2, 2019), https://www.atf.gov/rules-and-regulations/gun-control-act. The purpose of the 1968 law was to "regulate more effectively interstate commerce in firearms," to help "combat the skyrocketing increase in the incidence of serious crime," and to assist state and local governments "to enforce their firearms control laws." S. Rep. No. 89-1866, at 1 (1966). The GCA imposed stricter regulation of the firearms industry, defined new categories of firearms offenses, and placed further restrictions on the sale of firearms. See Gun Control Act of 1968, https://www.atf.gov/rules-and-regulations/gun-control-act.

Among many other provisions, the GCA made it a criminal offense for "any person [except] a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, to transport in interstate or foreign commerce any . . . machinegun (as defined in section 5845 of the Internal Revenue Code []) . . . except as specifically authorized by [the Attorney General] consistent with public safety and necessity." GCA § 102 (amending 18 U.S.C. § 922). The GCA also amended and expanded the definition of "machinegun" set forth in the NFA, to encompass "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger," as well as "the frame or receiver of any such weapon, any combination of parts designed and intended for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." GCA § 201 (amending I.R.C. § 5845).

Finally, in 1986 Congress passed FOPA, which amended the GCA by making it "unlawful for any person [with exceptions not relevant here] to transfer or possess a machinegun" not lawfully possessed before FOPA's effective date, May 19, 1986. FOPA §§ 102, 110 (amending 18 U.S.C. § 922). The new restrictions were intended, among other things, to protect law enforcement officers from the "proliferation" of machineguns, and to prevent "racketeers and drug traffickers" from using machineguns "for intimidation, murder and protection of drugs and the proceeds of crime." H.R. Rep. No. 99-495, at 4 (1986).

As amended by FOPA, and in its current form, a "machinegun" is defined in the United States code as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." I.R.C. § 5845(b). The Act left in place portions of the prior definition of "machinegun" that include "the frame or receiver of any such weapon." Id. It added new language, however, specifying that the term machinegun would also include "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun." FOPA § 109 (amending I.R.C. § 5845(b)).

## II.   Regulatory Framework

Congress has delegated the authority to promulgate rules and regulations necessary to enforce the provisions of the NFA and GCA to the Attorney General. See 18 U.S.C. § 926(a); 26 U.S.C. § 7805(a). The Attorney General, in turn, has delegated his authority to administer the statutes to the Director of ATF. 28 C.F.R. § 0.130(a).

Consistent with that delegation, ATF has published a number of regulations in the Federal Register which, after a period of notice and comment, were codified in the Code of Federal Regulations. These include provisions that incorporate and also elaborate on the definitions of certain statutory terms, including "machinegun." See 27 CFR pts. 478, 479.

ATF also "publishes rulings in its periodic bulletins and posts them on the ATF website." Bureau of Alcohol, Tobacco, Firearms and Explosives National Firearms Act Handbook ("ATF Handbook") § 1.4.2 (rev. Apr. 2009), https://www.atf.gov/firearms/docs/guide/atf-national-firearms-act-handbook-atf-p-53208/download. "These [rulings] contain ATF's interpretation of the law and regulations as they pertain to a particular fact situation." Id. They "do not have the force and effect of law but may be cited as precedent with respect to substantially similar fact situations." Id.

Finally, "ATF permits—but does not require—gun makers to seek classification letters from ATF prior to manufacturing a gun." See Sig Sauer, Inc. v. Brandon, 826 F.3d 598, 599 (1st Cir. 2016) (citing ATF Handbook § 7.2.4). ATF classification letters "may generally be relied upon by their recipients as the agency's official position concerning the status of the firearms under Federal firearms laws." ATF Handbook § 7.2.4.1. Such classifications, however, "are subject to change if later determined to be erroneous or impacted by subsequent changes in the law or regulations." Id. They do not have the force and effect of law. See Innovator Enters. v. Jones, 28 F. Supp. 3d 14, 23 (D.D.C. 2014).

## III.   Administrative Treatment of Bump-Stock Devices Before the Las Vegas Mass Shooting

Over the years, ATF has issued a number of rules and classification letters regarding the status of bump-stock devices under federal firearms laws. One of the cited purposes of the final rule at issue in this case was to reconcile the previously inconsistent approaches ATF had taken regarding the devices in the preceding almost twenty years. See Bump-Stock-Type Devices, 83 Fed. Reg. 66,514, 66,518 (Dec. 26, 2018) (noting that "prior ATF rulings concerning bump-stock-type devices did not provide substantial or consistent legal analysis regarding the meaning of the term 'automatically,' as it is used in the NFA and GCA").

In 2002, the inventor of the "Akins Accelerator"—a type of bump-stock device that is spring-powered to allow a semi-automatic firearm to "cycle back and forth, impacting the trigger finger without further input by the shooter while the firearm discharged multiple shots"— requested a classification opinion from ATF. Id. at 66,517. ATF initially determined that the Akins Accelerator was not a machinegun because, "the statutory term 'single function of the trigger' [referred] to a single movement of the trigger." Id.

ATF subsequently received several classification requests concerning devices that—like the Akins Accelerator—were "exclusively designed to increase the rate of fire of semiautomatic firearms." Id. In Ruling 2006-2, issued on December 13, 2006, ATF retreated from the position it had taken in its classification letter to the inventor of the Akins Accelerator. Id. In its Ruling, ATF reasoned that the phrase "single function of the trigger" was best understood to mean a "single pull of the trigger." Id. Moving forward, ATF stated, devices like the Akins Accelerator would be classified as machineguns if, "when activated by a single pull of the trigger, such devices initiate an automatic firing cycle that continues until either the finger is released or the ammunition supply is exhausted." Id. (citing ATF Ruling 2006-2) (internal quotations and alterations omitted).[1]

ATF subsequently received classification requests for other bump-stock devices which—unlike the Akins Accelerator—did not employ internal springs. Id. at 66,516. Instead, these devices "harnesse[d] and direct[ed] the firearm's recoil energy to slide the firearm back and forth so that the trigger automatically re-engage[d] by 'bumping' the shooter's stationary finger without additional physical manipulation of the trigger by the shooter." Id. In a series of classification decisions between 2008 and 2017, ATF concluded that these devices were not "machineguns" because, lacking internal springs or other mechanical parts that would channel the recoil energy of the gun, they did not fire "automatically." Id. at 66,517.

## IV.    The Regulation at Issue in this Case

In the wake of the mass shooting in Las Vegas, "ATF received correspondence from members of the United States Congress, as well as nongovernmental organizations, requesting that ATF examine its past classifications and determine whether bump-stock-type devices available on the market constitute machineguns under the statutory definition." Id. at 66,516. Based on this public reaction, and at the direction of the President, the Department of Justice revisited the issue of whether and under what circumstances bump-stock-type devices should be classified as machineguns. Id. at 66,516–517. On March 29, 2018, ATF published a notice of proposed rulemaking. Id. at 66,517; Bump-Stock-Type Devices, 82 Fed. Reg. 13,442 (Mar. 29, 2018) (notice of proposed rulemaking). The notice proposed changes to the regulations defining "machinegun" contained at 27 C.F.R. § 447.11, 478.11, and 479.11, and directed that public comment would close on June 27, 2018. 82 Fed. Reg. at 13,442.

ATF issued a final rule on December 26, 2018. 83 Fed. Reg. at 66,514. The new rule amended the definition of the term "machinegun" as used in parts 477 through 479 of the Code

---

[1] On January 19, 2007, ATF required the producer and distributor of the Akins Accelerator "to remove recoil springs from all Akins Accelerators and surrender them to ATF, thereby rendering the devices nonfunctional and without value." See Akins v. United States, 82 Fed. Cl. 619, 621 (2008). As described in greater detail below, the inventor subsequently brought an unsuccessful lawsuit in the Court of Federal Claims alleging a Fifth Amendment taking of his property. See id. at 620. He also unsuccessfully challenged the rule's lawfulness in federal district court. See Akins v. United States, 312 F. App'x 197 (11th Cir. 2009).

of Federal Regulations to specifically include bump-stock devices like the one used in the Las Vegas mass shooting. It states as follows:

> A "machinegun" . . . is a firearm which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger . . . . [T]he term "automatically". . . means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger and analogous motions . . . . The term "machinegun" includes a bump-stock-type device, i.e., a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

83 Fed. Reg. at 66,553–54 (codified at 27 C.F.R. §§ 447.11(b), 478.11, 479.11) (emphasis supplied).

The final rule provided that it would become "effective" on March 26, 2019, ninety days after promulgation. Id. at 66,514. In the Federal Register notice, ATF stated that individuals would be subject to "criminal liability only for possessing bump-stock-type devices after the effective date of regulation, not for possession before that date." Id. at 66,525; see also id. (stating that the final rule "criminalize[s] only future conduct, not past possession of bump-stock-type devices that ceases by the effective date"); id. at 66,539 ("To the extent that owners timely destroy or abandon these bump-stock-type devices, they will not be in violation of the law."). Bump-stock owners were directed to either abandon their devices at an ATF office by March 26, 2019 or destroy them by "melting, crushing, [] shredding," or using a hammer to disable them "in a manner that renders the device incapable of ready restoration." Id. at 66,549.

## V.    APA Litigation

The lawfulness of ATF's final rule defining bump-stock devices as machineguns is currently the subject of several Administrative Procedure Act ("APA") challenges before the United States District Courts for the District of Columbia, the Western District of Michigan, and the District of Utah. All three district courts denied motions for preliminary injunctions filed by the plaintiffs in those cases. Aposhian v. Barr, 374 F. Supp. 3d 1145 (D. Utah 2019), appeal docketed, No. 19-4036 (10th Cir. Mar. 18, 2019); Gun Owners of Am. v. Barr, 363 F. Supp. 3d 823 (W.D. Mich. 2019), appeal docketed, No. 19-1298 (6th Cir. Mar. 22, 2019); Guedes v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 356 F. Supp. 3d 109 (D.D.C. 2019), aff'd 920 F.3d 1 (D.C. Cir. 2019), petition for cert. filed, — U.S.L.W. — (U.S. Sept. 4, 2019) (No. 19-296).

In a recent decision, the United States Court of Appeals for the District of Columbia Circuit affirmed the district court's denial of the plaintiffs' motion for a preliminary injunction. Guedes, 920 F.3d at 6. It held that the plaintiffs had failed to show a substantial likelihood of success on the merits of their APA claim. Id. Finding that the rule was legislative as opposed to interpretive and applying the standards set forth in Chevron, U.S.A., Inc. v. Nat. Res. Def.

Council, Inc., 467 U.S. 837 (1984), the court of appeals held that the statutory definition of "machinegun" is ambiguous and that ATF's interpretation of the statute, under which bump-stock devices were included within that definition, was a reasonable one. Id. at 29.

## VI.     The Present Action

Plaintiffs Roy Lynn McCutchen and Paducah Shooter's Supply, Inc. filed a class action complaint in this court on December 26, 2018. See generally Compl. They allege that ATF's reclassification of bump stocks as machineguns effected a taking of their property without just compensation pursuant to the Fifth Amendment. Id. ¶¶ 40–52. They ask the Court to certify a class, to find that the government's actions violated the Fifth Amendment, and to award Plaintiffs compensation for their losses. Id. at 9.

The government filed a motion to dismiss for failure to state a claim on May 2, 2019. Mot. to Dismiss at 1, ECF No. 9. It contends that ATF's rule did not effect a compensable taking because it was issued pursuant to the government's police power and not its authority to take private property for a public use. Id. at 10. In the alternative, the government argues, even if the rule effected a taking, it was a regulatory and not a physical one, and not compensable under the multi-factor analysis prescribed for regulatory takings in Penn Central Transportation Co. v. City of New York, 438 U.S. 104, 124 (1978) and its progeny. Id. at 17.

Plaintiffs filed their response to the government's motion to dismiss on June 27, 2019. See generally Pls.' Opp'n. In their response, Plaintiffs allege that the final rule effected either a per se physical or per se regulatory taking of their property, so that the government has a categorical obligation to compensate them for the value of their property. Id.

Oral argument was held on the government's motion to dismiss on August 29, 2019.

## DISCUSSION

## I.     Jurisdiction

The Tucker Act authorizes the Court of Federal Claims "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a). Claims for damages under the Takings Clause of the Fifth Amendment are within this Court's Tucker Act jurisdiction. Preseault v. Interstate Commerce Comm'n, 494 U.S. 1, 12, (1990); see also Lion Raisins, Inc. v. United States, 416 F.3d 1356, 1368 (Fed. Cir. 2005); Narramore v. United States, 960 F.2d 1048, 1052 (Fed. Cir. 1992). Therefore, this Court has jurisdiction over the takings claims before it.

## II.     Standard for Motions to Dismiss under RCFC 12(b)(6)

A complaint should be dismissed under RCFC 12(b)(6) "when the facts asserted by the claimant do not entitle him to a legal remedy." Lindsay v. United States, 295 F.3d 1252, 1257 (Fed. Cir. 2002). When considering a motion to dismiss for failure to state a claim upon which relief may be granted, the Court "must accept as true all the factual allegations in the complaint,

and [the Court] must indulge all reasonable inferences in favor of the non-movant." <u>Sommers Oil Co. v. United States</u>, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (citations omitted); <u>see also Huntleigh USA Corp. v. United States</u>, 63 Fed. Cl. 440, 443 (2005). The Court, however, is not required to "accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." <u>Kowal v. MCI Commc'ns Corp.</u>, 16 F.3d 1271, 1276 (D.C. Cir. 1994) (citing <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986)).

## III.   Overview of Takings Principles

The Fifth Amendment's Takings Clause provides that private property shall not "be taken for public use without just compensation." U.S. Const. amend. V. The purpose of the Takings Clause is to prevent "Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." <u>Penn Cent.</u>, 438 U.S. at 123.

"Takings claims typically come in two forms: <u>per se</u> or regulatory." <u>Alimanestianu v. United States</u>, 888 F.3d 1374, 1380 (Fed. Cir. 2018). A per se (or "categorical") taking occurs where there is a physical invasion or appropriation of property, whether real, <u>Loretto v. Teleprompter Manhattan CATV Corp.</u>, 458 U.S. 419, 427 (1982), or personal, <u>Horne v. Dep't of Agric.</u>, 135 S. Ct. 2419, 2426 (2015). Further, a regulation that "denies all economically beneficial or productive use of land" also effects a per se or categorical taking. <u>Lucas v. S.C. Coastal Council</u>, 505 U.S. 1003, 1015 (1992).

"When the Government commits a per se taking, it has a categorical duty to pay just compensation." <u>Alimanestianu</u> 888 F.3d at 1380 (citing <u>Horne</u>, 135 S. Ct. at 2426). That duty exists "without regard to the claimed public benefit or the economic impact on the owner." <u>Horne</u>, 135 S. Ct. at 2427.

In addition to per se (or categorical) takings, the Supreme Court has recognized that where a regulatory restriction "does not entirely deprive an owner of property rights," <u>Horne</u>, 135 S. Ct. at 2429, but nonetheless goes "too far," <u>id.</u> at 2427 (quoting <u>Pa. Coal Co. v. Mahon</u>, 260 U.S. 393 (1922)), it may effect a regulatory taking. In <u>Penn Central</u>, 438 U.S. at 124, "the Court clarified that the test for how far was 'too far' required an 'ad hoc' factual inquiry." <u>Horne</u>, 135 S. Ct. at 2427. That ad hoc inquiry requires the court to consider "the character of the governmental action," "the extent to which the regulation has interfered with distinct investment-backed expectations," and "[t]he economic impact of the regulation on the claimant." <u>Alimanestianu</u>, 888 F.3d at 1381 (quoting <u>Penn Cent.</u>, 438 U.S. at 124).

Here, Plaintiffs contend that the ATF rule effected a physical taking or, alternatively, what they call a "per se regulatory taking," either of which gives rise to "a categorical duty to pay just compensation." Pls.' Opp'n at 7 (citing <u>Horne</u>, 135 S. Ct. at 2425–27); <u>id.</u> at 24 (explaining that "even if the Final Rule were construed as a regulatory taking, it would, nonetheless, be a <u>per se</u> regulatory taking"). For the reasons set forth below, Plaintiffs' arguments lack merit.

IV.     **The ATF Rule Prohibiting Bump-Stock Devices Was an Exercise of Police Power and Did Not Effect a Taking for Public Use**

As is evident from its plain language, the Takings Clause does not require compensation unless private property—whether personal or real—has been taken, whether physically or through regulation, "for public use." AmeriSource Corp. v. United States, 525 F.3d 1149, 1152 (Fed. Cir. 2008) (quoting U.S. Const. amend. V) ("The clause does not entitle all aggrieved owners to recompense, only those whose property has been 'taken for a public use.'"). Further, it is well established that there is no taking for "public use" where the government acts pursuant to its police power, i.e. where it criminalizes or otherwise outlaws the use or possession of property that presents a danger to the public health and safety. See Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 491 (1987) (explaining that the Takings Clause does not transform the government's power to "restrict[] the uses individuals can make of their property . . . to one that requires compensation whenever the State asserts its power to enforce it"); Miller v. Schoene, 276 U.S. 272, 279–80 (1928) (holding that no taking occurred where the state ordered the destruction of red cedar trees to protect health of apple trees and observing that "where the public interest is involved, preferment of that interest over the property interest of the individual, to the extent even of its destruction, is one of the distinguishing characteristics of every exercise of the police power which affects property"); Mugler v. Kansas, 123 U.S. 623, 668–69 (1887) ("A prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit."); AmeriSource, 525 F.3d at 1153 (noting that "it is clear that the police power encompasses the government's ability to seize and retain property to be used as evidence in a criminal prosecution").

Of course, "it is insufficient to avoid the burdens imposed by the Takings Clause simply to invoke the 'police powers' of the state." Acadia Tech., Inc. v. United States, 458 F.3d 1327, 1332 (Fed. Cir. 2006). Nonetheless, there are certain exercises of the police power "that ha[ve] repeatedly been treated as legitimate even in the absence of compensation to the owners of the . . . property." Id. at 1332–33. Among these are government actions taken to enforce prohibitions on the use or possession of dangerous contraband, or to require the forfeiture of property used in connection with criminal activity. See e.g., Bennis v. Michigan, 516 U.S. 442, 453 (1996) (holding that the forfeiture of an innocent owner's property that was used in a crime was not a taking); Kam-Almaz v. United States, 682 F.3d 1364, 1371 (Fed. Cir. 2012) (quoting AmeriSource Corp., 525 F.3d at 1153) (finding that a laptop "seized and retained pursuant to the police power" at a border crossing was "not taken for a 'public use' in the context of the Takings Clause"); AmeriSource Corp, 525 F.3d at 1155 (finding that the seizure of pharmaceuticals from an innocent third party for use in a criminal prosecution was an exercise of police power and not a taking); Holliday Amusement Co. of Charleston, Inc. v. South Carolina, 493 F.3d 404, 411 n.2 (4th Cir. 2007) (finding that a state statute outlawing possession of video gaming machines did not effect a taking and observing that regulations for the public good in heavily regulated fields such as gambling "per se do not constitute takings"); Acadia Tech, 458 F.3d at 1332 (determining that a customs seizure of goods suspected of bearing counterfeit marks is not a compensable taking for public use but was instead "a classic example of the government's exercise of the police power to condemn contraband or noxious goods"); United States v. $7,990.00, 170 F.3d 843, 845 (8th Cir. 1999) ("[F]orfeiture of contraband is an exercise of the government's police power, not its eminent domain power.").

In this case, Plaintiffs' bump-stock devices were not "taken for a public use," within the meaning of the Takings Clause. Instead, because the devices have been designated as machineguns under ATF's regulatory authority, they are subject to 18 U.S.C. § 922(o), which makes their possession a criminal offense. ATF, in the exercise of its police power, directed that owners of the devices must either destroy or abandon them at an ATF office, to avoid prosecution. Because the prohibition on possession involved an exercise of the government's police power, there was no taking within the meaning of the Fifth Amendment.

In Akins v. United States, 82 Fed. Cl. 619, 623 (2008), the court similarly concluded that ATF was exercising police power when it reclassified another bump-stock-type device—the so-called "Akins Accelerator"—as a machinegun, and directed the owners of the device to surrender its recoil springs. The court reasoned that when ATF classified the Akins Accelerator as a machinegun and ordered its inventor to surrender the springs, it was acting under its authority to enforce 18 U.S.C. § 922(o), which outlaws the possession or transfer of machineguns. Id. Because "ATF was acting pursuant to the police power conferred on it by Congress," the court concluded, the plaintiff had failed to state a claim under the Takings Clause. Id.

The United States District Court for the District of Maryland recently reached a similar conclusion in Maryland Shall Issue v. Hogan. See generally 353 F. Supp. 3d 400 (D. Md. 2018). It rejected plaintiffs' claim that their property (bump stocks and similar devices) was taken without just compensation as a result of a state law that made it unlawful for any person to "'manufacture, possess, sell, offer to sell, transfer, purchase, or receive a rapid fire trigger activator' or to 'transport' such a device into the state." Id. at 405. The court observed that the state legislature had "considered the ability of bump stocks and similar devices to inflict mass injury and mass casualties with great speed, as well as their use to horrific effect in Las Vegas" and "concluded that these devices pose such an unreasonable risk to public safety that they should be banned from Maryland." Id. at 410. It held that the law "falls well within Maryland's traditional police power to define and ban ultra-hazardous contraband" and so did not effect a taking for public use within the meaning of the Fifth Amendment. Id.[2]

The Court finds these decisions relevant and persuasive. The ATF regulation at issue here was promulgated pursuant to statutory authority and consistent with our nation's "historical tradition of prohibiting . . . dangerous and unusual weapons." District of Columbia v. Heller, 554 U.S. 570, 627 (2008) (internal quotation marks omitted). Weapons within these prohibitions have included machineguns and others that are used primarily by the military in warfare. See id. at 624; Hollis v. Lynch, 827 F.3d 436, 451 (5th Cir. 2016) (observing that machineguns do not receive Second Amendment protection "because they are dangerous and unusual and therefore not in common use"); Akins, 82 Fed. Cl. at 624 (observing that the manufacture and sale of firearms is "subject to pervasive federal regulation"). Banning the possession of such weapons

---

[2] See also Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J., 910 F.3d 106, 124 n.32 (3d Cir. 2018) (stating, in dicta, that New Jersey's ban on large capacity magazines "seeks to protect public safety and therefore it is not a taking at all," and observing that "[a] compensable taking does not occur when the state prohibits the use of property as an exercise of its police powers rather than for public use.") (citing Lucas, 505 U.S. at 1027–28, 1027 n.14; Mugler, 123 U.S. at 668–69; Nat'l Amusements Inc. v. Borough of Palmyra, 716 F.3d 57, 63 (3d Cir. 2013)).

and requiring their owners to divest themselves of such tools of war is the paradigmatic example of the exercise of the government's police power, which defeats any entitlement to compensation under the Takings Clause.

The Court finds no merit in Plaintiffs' contention that the police power doctrine does not apply where, as here, the property owners came into possession of their bump-stock devices lawfully and continued to lawfully possess them until the effective date of the ATF rule.[3] Plaintiffs have failed to cite a single case in which a court has found this distinction significant. They also fail to point to a case that has found the police powers doctrine inapplicable in circumstances where an individual is required to destroy or abandon property that was designated as contraband after the owner first came into possession of it. See Samuels v. McCurdy, 267 U.S. 188, 198–99 (1925) (finding no taking where liquor once lawfully purchased and possessed was seized and destroyed pursuant to the police power under subsequent law prohibiting liquor possession). As the district court in Maryland Shall Issue observed, "[p]ractically all products later defined as contraband were not contraband before the enactment of the law that named them as such." 353 F. Supp. 3d at 409–10. Yet no court has ever ruled that the government must compensate individuals who are required to divest themselves of dangerous items if the ban on their possession is of recent vintage.

Moreover, the rationale of the police powers doctrine is that it is improper to "burden[]" the government's power to prohibit the use of property in a manner that endangers public safety "with the condition that the state must compensate such individual owners for pecuniary losses they may sustain, by reason of their not being permitted, by a noxious use of their property, to inflict injury upon the community." Mugler, 123 U.S. at 669. That rationale applies regardless of whether the property now thought to present a danger to public health and safety was once lawfully held.

In short, under ATF's final rule, Plaintiffs' bump-stock devices were not taken for a public use, but were instead prohibited through the government's exercise of its police power. For this reason alone, Plaintiffs have failed to state a takings claim.

## V.     The Regulation Did Not Effect a Categorical Taking

Even if the police power doctrine were inapplicable, the Court would nonetheless dismiss the complaint because there is no merit to Plaintiffs' argument that the rule effected a categorical taking of their bump-stock devices.

---

[3] Citing the D.C. Circuit's decision in Guedes, 920 F.3d 1 (described above), Plaintiffs go on at some length in their opposition to establish that the rule at issue here is a "legislative," rather than interpretive one. See, e.g., Pls.' Opp'n at 2–3. The purpose of this discussion, as the Court understands it, is to show that until the regulation was enacted, there was no prohibition— statutory or regulatory—against the possession of bump-stock devices. The Court sees no reason to delve into this issue given its conclusion, discussed in the text, that the fact that the prohibition was only recently enacted is irrelevant to the applicability of the police powers doctrine.

### A.   No Physical Taking

First, the final rule did not result in the physical appropriation of Plaintiffs' bump-stock devices. Instead, it imposed a criminal prohibition on their possession of bump-stock devices, enforced by requiring their owners to either destroy them or abandon them at an ATF office for destruction. In Plaintiffs' case, in fact, the bump-stock devices were never turned over to the government. Instead, Plaintiffs destroyed them on their own.

Plaintiffs' reliance on Horne v. Department of Agriculture in support of their per se physical takings argument is misplaced. The physical taking in that case arose out of a U.S. Department of Agriculture marketing order which required raisin growers to set aside a portion of their crop in certain years for the account of the government, free of charge. 135 S. Ct. at 2424. In accordance with the order, raisin growers were required to ship all of their raisins to a raisin "handler" who would separate out the portion due the government and pay the growers only for the remainder. Id. A "Raisin Administrative Committee" would take title to the raisins allotted to the government (known as "reserve raisins") and then dispose of them in various authorized ways, including selling them in non-competitive markets or donating them to charity. Id. Proceeds from sales were used primarily to subsidize handlers who sold raisins for export. Id.

The central issue before the Court in Horne was whether the government's "'categorical duty' under the Fifth Amendment to pay just compensation when it 'physically takes possession of an interest in property'" applied to personal as well as real property. Id. at 2425 (quoting Ark. Game & Fish Comm'n v. United States, 133 S. Ct. 511, 518 (2012)). The Court answered that question in the affirmative. Id. Further, it found that the reserved requirement effected "a clear physical taking." Id. at 2428. Actual raisins were transferred from the growers to the government. Id. at 2424. Title to the raisins passed to the Raisin Committee. Id. And the Committee "disposes of what become its raisins as it wishes" to promote the marketing order's purposes. Id. at 2428. Because the government took title to and then directly appropriated the raisins for its own use, the Court held, it had effected a per se physical taking that required compensation. Id. at 2426.

Here, by contrast, the ATF Rule did not effect a physical taking of Plaintiffs' property. Plaintiffs were not required to surrender possession of their devices to the government. There was no transfer of title to the government. And if Plaintiffs had chosen to abandon their bump-stock devices at the local ATF office, the agency would not have put the devices to its own use; it would have destroyed them. The USDA regime of direct physical appropriation of private property for the government's own use is distinguishable from the criminal prohibition on possession of personal property deemed dangerous, enforced by a requirement that the property be destroyed or abandoned.

Indeed, in Horne itself, the Court acknowledged that, had the government simply prohibited the sale of the raisins by the growers, it would not have effected a per se taking. "[T]hat distinction," the Court observed, "flows naturally from the settled difference in our takings jurisprudence between appropriation and regulation." Id. at 2428.

In short, there is no merit to Plaintiffs' argument that the ATF rule effected a per se physical taking of their bump-stock devices. The Court therefore turns to Plaintiffs' alternative argument that the rule effected a per se regulatory taking.

### B.      The Rule Did Not Effect a "Per Se Regulatory Taking"

Plaintiffs contend that even if the rule did not effect a physical taking, "it would, nonetheless, be a per se regulatory taking." Pls.' Opp'n at 24 (emphasis removed). As explained above, the Supreme Court has held that regulatory actions may result in categorical or per se takings where they "den[y] all economically beneficial or productive use of land." Lucas, 505 U.S. at 1015.

The Supreme Court has never decided whether and to what extent this standard applies to personal property. As the Court explained in Horne, Lucas's application of a categorical standard to certain takings of real estate was grounded at least in part in the recognition "that while an owner of personal property 'ought to be aware of the possibility that new regulation might even render his property economically worthless,' such an 'implied limitation' was not reasonable in the case of land." Horne, 135 S. Ct. at 2427 (quoting Lucas, 505 U.S. at 1027–28).

In A & D Auto Sales, Inc. v. United States, the Federal Circuit noted that it had, "on occasion," applied the Lucas standard where it was alleged that personal property had been rendered economically worthless. 748 F.3d 1142, 1151 (Fed. Cir. 2014) (citing Rose Acre Farms, Inc. v. United States, 373 F.3d 1177, 1196–98 (Fed. Cir. 2004); Maritrans, Inc. v. United States, 342 F.3d 1344, 1353–55 (Fed. Cir. 2003)). But A & D Auto Sales did not engage in any analysis of the propriety of that approach given the Lucas Court's recognition of the different expectations attached to the regulation of personal as opposed to real property. Further, as the court of appeals acknowledged in A & D Auto Sales, "other circuits view the Lucas test as applying only to land." Id. (citing Hawkeye Commodity Promotions, Inc. v. Vilsack, 486 F.3d 430, 441 (8th Cir. 2007); Unity Real Estate Co. v. Hudson, 178 F.3d 649, 674 (3d Cir. 1999)); see also Horne v. Dep't of Agric., 750 F.3d 1128, 1140 (9th Cir. 2014), rev'd on other grounds, 135 S. Ct. 2419 (stating that it is clear the holding of Lucas is limited to cases involving land). It appears, therefore, that the Federal Circuit has not squarely addressed whether and under what circumstances the Lucas categorical regulatory taking standard applies to personal property.[4]

Plaintiffs contend that the Supreme Court's reference in Lucas to the "implied limitation" on the expectations of owners of personal property is only applicable in the commercial context, and not to the mere ownership or possession of personal property. See Pls.' Opp'n at 25–26.

---

[4] Neither of the two cases cited in A & D Auto Sales held that a categorical taking under Lucas occurs where a government regulation renders personal property economically worthless. In Rose Acre Farms, Inc., the court of appeals agreed with the trial court's rejection of "the government's contention that a 'per se' takings analysis is never applicable when personal property is at issue," but found no such taking in that case. 373 F.3d at 1196 (emphasis supplied). In Maritrans, Inc., the court of appeals applied the standard to personal property without discussing the dichotomy between real and personal property discussed in Lucas, but ultimately found that no categorical taking had occurred. 342 F.3d at 1353–54.

Thus, Plaintiffs argue that, in <u>Lucas</u>, the Court observed that "in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, [an owner] ought to be aware of the possibility that new regulation might even render his property economically worthless (at least if the property's only economically productive use is sale or manufacture for sale)." <u>Id.</u> at 25.

Of course, the only economically productive use of bump-stock devices is in their sale, manufacture for sale, or related commercial use. Plaintiff Paducah Shooter's Supply, Inc., for example, sells firearms and their accessories and operates a shooting range. It also previously provided bump-stock devices for patrons to use when it held so-called "machine gun shoots." Compl. ¶ 11. Likewise, Plaintiff Roy Lynn McCutchen alleges that he has "purchased and owns multiple bump-fire type devices for both his personal use and for economic gain." Id. ¶ 10 (emphasis supplied).

Further, the Supreme Court's observations regarding the relative expectations of owners of personal property (as compared to owners of real property) surely apply to personal property whose ownership itself is subject to pervasive government regulation, as is the ownership of firearms in general, and machineguns in particular. <u>Cf.</u> <u>Mitchell Arms v. United States</u>, 7 F.3d 212, 213, 216 (Fed. Cir. 1993) (finding no enforceable rights sufficient to support a takings claim where plaintiff whose license to import assault rifles was suspended and then revoked "voluntarily entered the firearms import business, thereby knowingly placing itself in the governmentally controlled arena of firearms importation").

For these reasons, it appears to the Court that—even assuming there are circumstances in which the <u>Lucas</u> categorical taking standard could be applied to personal property—it should not be applied here. The Court therefore rejects Plaintiffs' argument that the ATF rule effected a categorical or per se regulatory taking of their property.

## VI.    Regulatory Taking Under <u>Penn Central</u>

Plaintiffs' complaint appears to be based on the theory that the ATF rule effected a regulatory taking under the <u>Penn Central</u> analysis. That analysis, as noted above, requires the Court to balance several factors when deciding whether compensation is owed for a regulatory taking. These include "[t]he economic impact of the regulation on the claimant," "the character of the governmental action," and "the extent to which the regulation has interfered with distinct investment-backed expectations." <u>Penn Cent.</u>, 438 U.S. at 124.

In opposing the government's motion to dismiss, however, Plaintiffs do not argue that the ATF rule effects a regulatory taking under <u>Penn Central</u>. Instead, they have chosen to rely upon the categorical takings theories described above. Any argument based on <u>Penn Central</u> has therefore been waived. <u>See, e.g.</u>, <u>Md. Shall Issue</u>, 353 F. Supp. 3d at 413 n.5 (declining to evaluate plaintiffs' claims under the <u>Penn Central</u> test where the plaintiffs put forth only per se takings theories).

In any event, even if the argument were not waived, Plaintiffs have failed to state a regulatory takings claim under <u>Penn Central</u>. Plaintiffs have alleged that the ATF rule has "destroyed all economic value" of their bump-stock devices. Compl. ¶ 41. But their allegations

14

are insufficient to establish a regulatory taking upon consideration of the character of the government's actions and the extent to which the rule interferes with reasonable investment-backed expectations.

As the Supreme Court has observed, "the nature of the State's interest in the regulation is a critical factor in determining whether a taking has occurred, and thus whether compensation is required." Keystone Bituminous Coal Ass'n, 480 U.S. at 488. Where, as here, the government's action is aimed at protecting the public health and safety, that fact weighs strongly against finding a regulatory taking. See, e.g., Dimare Fresh, Inc. v. United States, 808 F.3d 1301, 1311 (Fed. Cir. 2015) (finding that FDA press releases and media briefing warning consumers about an outbreak of salmonella in tomato producers' products did not effect a regulatory taking in part because the agency was acting to protect public health and safety); Rose Acre Farms, 559 F.3d at 1281 (holding that a USDA regulation which mandated that egg producers remove diseased eggs from the market was not a taking because the government was protecting public health); Appolo Fuels, Inc. v. United States, 381 F.3d 1338, 1351 (Fed. Cir. 2004) (holding that the government's decision to declare a portion of a watershed unsuitable for mining under the Surface Mining Control and Reclamation Act was "the type of governmental action that has typically been regarded as not requiring compensation for the burdens it imposes on private parties who are affected by the regulations" (quoting Rith Energy, Inc. v. United States, 270 F.3d 1347, 1352 (Fed. Cir. 2001))); Rith Energy, Inc., 270 F.3d at 1352 (holding that a federal agency's decision to revoke a coal mining permit "was an exercise of the police power directed at protecting the safety, health, and welfare of the communities surrounding the Rith mine site by preventing harmful runoff").

Further, the regulation does not interfere with what can fairly be considered reasonable investment-backed expectations. The investment-backed expectations factor "is designed to account for property owners' expectation that the regulatory regime in existence at the time of their acquisition will remain in place, and that new, more restrictive legislation or regulations will not be adopted." Love Terminal Partners, L.P. v. United States, 889 F.3d 1331, 1345 (Fed. Cir. 2018).

"[R]easonable investment-backed expectations are greatly reduced in a highly regulated field." Branch v. United States, 69 F.3d 1571, 1581 (Fed. Cir. 1995). The firearms industry is the quintessential "highly regulated field." It is subject "pervasive Government control." Akins, 82 Fed. Cl. at 623 (quoting Mitchell Arms, Inc. v. United States, 26 Cl. Ct. 1, 5 (1992), aff'd, 7 F.3d at 212). Anyone who enters the firearms industry has to be aware that shifting public sentiments, evolving research concerning firearms availability and public safety, and events like the Las Vegas mass shooting may lead to rule changes that render unlawful what was once permissible.

In particular, Plaintiffs could not have reasonably expected that existing rules regarding bump-stock devices would not be made more restrictive. Such devices, after all, are designed to enable semi-automatic weapons to simulate the firepower of machineguns, whose possession has been prohibited for decades.[5]

---

[5] In their complaint, but not in their opposition to the government's motion to dismiss, Plaintiffs allege that their investment-backed expectations in the lawfulness of their devices were

Plaintiffs, in short, have waived any argument based on the <u>Penn Central</u> analysis by failing to make it in opposing the government's motion to dismiss. And even if the argument were not waived, the Court concludes that they have failed to allege a regulatory taking claim under <u>Penn Central</u>.

## CONCLUSION

For the foregoing reasons, the government's motion to dismiss for failure to state a claim is **GRANTED**. The complaint will be **DISMISSED with prejudice**. The Clerk is directed to enter judgment accordingly. Each side will bear its own costs.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge

---

reasonably based on prior ATF classification letters. Compl. ¶¶ 17–24, 42. But as discussed above, classification letters lack the force and effect of law and are explicitly made subject to subsequent changes in the law or regulations. <u>See</u> <u>Lucas</u>, 505 U.S. at 1027–28 (observing that an owner of personal property "ought to be aware of the possibility that new regulation might even render his property economically worthless").